ERNEST L. RINK AND RUTH E. RINK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2643-67.   Filed February 10, 1969.

Ernest L. Rink, pro se.
*Gordon B. Cutler*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioners' income tax in the amount of $443.77 for the taxable year ended December 31, 1964, and $436.92 for the taxable year ended December 31, 1965. Several issues have been settled by agreement of the parties; there remain for our decision the following issues:

(1) May the petitioners deduct on their individual income tax returns personal property taxes and other expenses paid by them on behalf of a corporation of which they own substantially all the outstanding stock?

(2) May the petitioners deduct on their individual income tax returns, either as depreciation or as a loss, an alleged decline in value in 1964 and 1965 of a cabin and of certain mining equipment, both owned by such corporation?

(3) May the petitioners deduct on their individual income tax returns amounts estimated by them to be the value of certain work done on mining claims owned by such corporation in 1964 and 1965?

(4) Are the petitioners entitled to a deduction for the alleged business use of their residence by Mr. Rink in an amount greater than that allowed by the respondent?

(5) May the petitioners deduct, as the expenses of operating a truck owned by Mr. Rink and used in his business activities in 1965, an amount greater than that allowed by the respondent?

In addition, the petitioners contend that they are entitled to additional deductions for 1964 and 1965, (a) for amounts equal to their estimate of the value of work done by Mr. Rink on mining claims owned by him in 1964 and 1965, and (b) for amounts equal to their estimate of value of research done by Mr. Rink principally for the benefit of the corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners are husband and wife whose legal residence was Carson City, Nev., at the time the petition was filed in this case. They filed their joint Federal income tax returns for the taxable years 1964 and 1965, using the cash method of accounting, with the district director of internal revenue, Reno, Nev. Mrs. Rink is a party to this proceeding solely by reason of having filed a joint return with her husband; consequently, Mr. Rink will hereinafter be referred to as the petitioner.

The petitioner, who was 80 years of age at the time of the trial in this case, has been engaged at least since 1942 in activities related to the

mining and processing of gold ore. He believed there was a method of identifying and extracting "carbonaceous gold" from the earth, and devoted a great deal of time and effort in metallurgical research to this end, principally on behalf of the Cambridge Mining Co., Inc. (Cambridge). He did other research with respect to the use of clay from certain mining claims owned by Cambridge as a cure for cancer.

Cambridge is a corporation organized under the laws of Nevada in July 1935. In 1964 and 1965 it was engaged in mineral exploration. In 1942, the petitioner first went to work for Cambridge. One of his first tasks was to relocate and make operational a mill bought by Cambridge in 1935.[1] The petitioner made the mill operational, and Cambridge produced a small amount of gold and zinc shavings, which was subsequently sold for approximately $300. Five days after it was made operational, in 1942, the Cambridge mill, like other gold mills, was closed down by order of the U.S. Government. The only income derived by the corporation after the petitioner became connected with it to the date of the trial in this case was the amount received in 1942 for the gold and zinc shavings.

After the mill was closed down, equipment necessary to its operation was taken away, although the mill itself was not removed. The record does not show who took it or why.

In 1949, the owners of the Cambridge stock made a gift of it to the petitioners. The record does not disclose their basis in the stock at the time of this gift. After acquiring the stock, the petitioner transferred a small amount to others, in order that Cambridge could have a board of directors and be a fully operational corporation under Nevada law. This constituted the only transaction in Cambridge stock after 1949. During 1964 and 1965, the stock of Cambridge was owned as follows:

| Shares | Owner |
|---|---|
| 102,450 | Petitioner |
| 5,745 | Shareholders unrelated to petitioners—acquired by transfer from petitioner |
| 91,805 | Treasury stock |
| 200,000 | |

The petitioner was the president of Cambridge, and Mrs. Rink its treasurer, in both years.

In 1964 and 1965, Cambridge owned the gold mill previously described, a sawmill, a cabin, and 13 mining claims. The record does not disclose the cost of either mill, but both were acquired by Cambridge prior to 1942. The cabin was constructed by Cambridge in 1935 at a cost estimated by the petitioner at between $1,500 and $2,000. At the date of the gift of the stock to the petitioner, he and the transferors

---

[1] Nowhere in the record is there an explanation of the nature of this mill, which was in some way connected with the processing of gold ore.

believed the physical property owned by Cambridge to be "junk" of no market value. In 1964 and 1965, it also had no market value, but the petitioner believed then, as he believed in 1949, that it had value to him.

The records of Lyon County, Nev., in which Cambridge's personal property was located, show that in 1964–65 and 1965–66 the property had an assessed value of $500. The petitioner paid personal property tax assessed against this property of $16.62 in 1964 and $16.95 in 1965.

In 1956, the petitioner purchased a bus for a nominal amount and transferred it to Cambridge, which licensed it. In 1965, the State of Nevada issued to Cambridge a 1965 registration certificate covering the bus; the certificate recorded the payment, which was made by the petitioner, of the registration fee and tax for that year, totaling $11.50.

In 1964 and 1965, the petitioner, on behalf of Cambridge, filed with the secretary of state of the State of Nevada the list of officers and directors required by Nevada's corporation law and paid the filing fees.

During 1964 and 1965, Cambridge's mill was subjected to vandalism. The petitioner estimated the loss due to vandalism of the mill at $1,000 each year and deducted such amounts on his income tax returns as "depreciation." In both years, the cabin owned by Cambridge suffered damage from a windstorm as well as from vandalism; the petitioner estimated the damage at $150 for each year.

Sometime prior to 1964, Cambridge acquired 13 mining claims which it owned during 1964 and 1965. The petitioner individually owned other mining claims during those years. Federal and Nevada law provide that each year $100 worth of labor must be performed or improvements must be made on each claim of the type held by Cambridge and the petitioner to maintain possession thereof. On both the Cambridge claims and his own claims, the petitioner did research work and physical labor which he valued at $100 per claim. The petitioner has never paid, nor has Cambridge paid, the $1,300 claimed as the value of the petitioner's work on the claims in each of 1964 and 1965, and such amounts do not constitute a liability entered on the books of either the petitioner or Cambridge. The petitioner estimates that the work done by him on his own claims in 1965 had a value of $5,900, but he has never paid this amount nor incurred a liability on his books therefor.

Cambridge filed corporate income tax returns for 1965 and 1966, signed by the petitioner as president. The 1965 return showed no gross income and no deductions, but contained the following statement:

Since this corporation is dormant, yet in good standing, being held for possible future profitable operation, we elected to take all responsibility and costs of maintaining same individually since over ninety percent of the issued stock is held by us. We therefore have reported said costs as deductions on our joint income tax return.

Cambridge's return for 1966 showed no gross income, but reported a deduction of $9,500 as salary expense and $1,300 as "Annual as-

sessment on * * * [mining] claims." At no time during its existence has Cambridge made an election under section 1372 of the Internal Revenue Code of 1954 [2] to have its income and losses passed through to its shareholders.

On their individual income tax returns for 1964 and 1965, the petitioner and Mrs. Rink claimed deductions for, *inter alia*, the taxes and fees paid on behalf of Cambridge in each year, "depreciation" based on the damage to the mill owned by Cambridge (estimated at $1,000 for each year), and the damage to the Cambridge cabin estimated at $150 each year. The respondent disallowed these deductions. In this proceeding, the petitioner for the first time claims that for each year he is entitled to a salary deduction of $24,000 reflecting his estimate of the value of his research, primarily on behalf of Cambridge, and $5,900 reflecting his estimate of the value of the work done to maintain the mining claims owned by him personally.

The petitioner used a portion of his residence for his own business purposes in 1964 and 1965. He used one room of his house as an office and stored his mining records there; he used a shed behind his house as a laboratory, where he carried on his metallurgical research. The record does not show the total expenses of maintaining the petitioner's household nor what amounts, if any, were allocable to the office space and laboratory. In this proceeding, the petitioner claims a deduction for such business use, but he has failed to show that the portion of his total household expenses allocable to such business use exceeded $100 each year, the amount allowed as a deduction by the respondent.

In October 1965, the petitioner purchased a used truck which he used to travel between his laboratory or office and his claims, a distance of 90 miles each way. He used it for 3 months in 1965 and drove it 2,727 miles on business in that year.

OPINION

The petitioner claimed a variety of deductions on his individual income tax returns for 1964 and 1965, or in this proceeding, which have been disallowed in whole or in part by the respondent. The parties have reached agreement on some, but not all, of the disputed deductions, leaving to us the decision with respect to the others.

Several of the disputed items may be dealt with together. The petitioner claimed deductions for amounts which he paid on behalf of Cambridge as follows: (a) Annual filing fees imposed by Nevada law on Cambridge; (b) personal property taxes assessed by Lyon County against property owned by Cambridge; and (c) the annual

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

registration fee and tax for 1965 levied by the State of Nevada on a bus owned by Cambridge. The rule is well established that a shareholder, even a majority or sole shareholder, is not entitled to a deduction from his personal income for his payment of the expenses of his corporation; such amounts constitute either a loan or a contribution to the capital of the corporation and are deductible, if at all, by the corporation.[3] E.g., *Deputy* v. *duPont*, 308 U.S. 488 (1940); *Jean U. Koree*, 40 T.C. 961 (1963).

To prevail, the petitioner must establish that the facts of this case present a situation to which the general rule does not apply. He claims first that Cambridge was a "personal service corporation," but this is a concept which has no meaning under the 1954 Code (except as to certain corporations making elections provided for under the 1939 Code and prior revenue acts). Cambridge has made no such election, and the tax treatment provided for personal service corporations and their shareholders under prior law does not obtain under present law. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 22–23 (2d ed. 1966). Accordingly, this claim of the petitioner in no way supports his treatment of the disputed items.

It is clear, as we have found, that Cambridge was not an "electing small business corporation" under subchapter S during 1964 and 1965, and the petitioner therefore may not avail himself of any benefit which section 1374 might otherwise offer.

The petitioner states that he was obligated to make the payments on behalf of the corporation inasmuch as he could not compel the minority shareholders, who held fully paid nonassessable stock, to do so. But this statement, even if true, provides no ground for a deduction by the petitioner of items which are not in any tax sense his expenses. Moreover, the petitioner overlooks the fact that technically he stood in the same relationship vis-a-vis the corporation as did the other shareholders; it was his desire to maintain the corporation as a continuing entity and not any provision of law which "obligated" him to make such payments.

The petitioner appears to go further to argue that we should disregard the corporate entity and treat Cambridge's property as his own property and the taxes and fees levied thereon as his personal obligation. He finds support for his argument in two facts: (a) He owned almost all of the outstanding stock of the corporation, and (b) the corporation was "dormant" during 1964 and 1965 in that it had no income and was not actually engaged in the activity for which it was maintained—the extraction and sale of minerals.

[3] We are not dealing here with a case where such payment is a liability or ordinary and necessary business expense of the shareholder in his own capacity. See and compare *James L. Lohrke*, 48 T.C. 679 (1967), and cases there cited.

"The doctrine of corporate entity fills a useful purpose in business life." *Moline Properties* v. *Commissioner*, 319 U.S. 436, 438 (1943). It is well established in the tax law. It is a rare case in which the taxpayer, having chosen to avail himself of the corporate form, will be allowed to disregard it in order to reduce his taxes.

Whether the purpose [of incorporating] be to gain an advantage under the law of the state of incorporation [2] or to avoid [3] or to comply with [4] the demands of creditors *or to serve the creator's personal or undisclosed convenience,*[5] so long as that purpose is *the equivalent of business activity or is followed by the carrying on of business by the corporation,* the corporation remains a separate taxable entity. [*Moline Properties* v. *Commissioner, supra* at 438–439. Footnotes omitted; emphasis added.]

The fact that a shareholder owns most or all of the corporation's stock does not justify his disregarding its separate existence so long as it serves a business purpose or engages in business, i.e., is not a mere sham. E.g., *Ernest H. Weigman*, 47 T.C. 596 (1967), affirmed per curiam 400 F. 2d 584 (C.A. 9, 1968) ; *Sebago Lumber Co.*, 26 T.C. 1070 (1956). Nor must the degree of business activity be great:

If the entity has not been completely inert * * * the taxpayer is likely to meet both administrative and judicial resistance when he seeks to disregard the separate existence of his own creature. [Bittker & Eustice, *supra* at 42]

See generally 7 Mertens, Law of Federal Income Taxation, secs. 38.04–38.13, pp. 6–36.

We are not prepared to say that Cambridge was a sham. During 1964 and 1965, as in prior years, Cambridge owned property—the bus, the mill, the cabin, and the mining claims—and took such action as was necessary to preserve it. Acting through its president, the petitioner, it annually perfected its mining claims, it repaired its damaged property, and it carried on continuous research to the end of developing a process which would make its property productive of income. Such activity is sufficient we think to maintain life in the taxable person which performed it. This activity, together with the petitioner's consistent efforts to maintain the corporation as a separate viable entity and his treatment of it as such, lead us to conclude that it should be recognized as such for tax purposes. Consequently, the payments made by the petitioner on behalf of Cambridge are deductible, if at all, by Cambridge, and, in any event, not by the petitioner. *Ernest H. Weigman, supra; Jean U. Koree, supra; Brudno* v. *Commissioner*, 138 F. 2d 779 (C.A. 6, 1943), affirming a Memorandum Opinion of this Court; *Gustav W. Lembeck*, 16 B.T.A. 250 (1929) ; *Samuel Riker, Jr.*, 15 B.T.A. 1160 (1929).

The same reasoning applies to the depreciation deductions claimed by the petitioner. These deductions claimed on the petitioner's returns for 1964 and 1965 reflected his estimate of the loss in value suffered by the mill and cabin owned by Cambridge in those years. It appears that the claimed loss of value actually occurred from vandalism and windstorm rather than from wear and tear due to business use; thus, it is the loss provisions of section 165 that are relevant. See *Burrell E. Davis*, 34 T.C. 586 (1960). In either event, the result is the same; the corporation, not the petitioner, owned the property, so the petitioner is not entitled to a deduction with respect to the alleged losses. *Robert L. Hunter*, 46 T.C. 477 (1966) (depreciation); *Sas-Jaworsky v. Commissioner*, 379 F. 2d 337 (C.A. 5, 1967), affirming per curiam a Memorandum Opinion of this Court (casualty loss). This conclusion makes it unnecessary to consider such problems as the lack of evidence in the record concerning the cost and adjusted basis of the properties, the amount of the losses, or the business use of the properties.

On his returns, the petitioner claimed deductions for the estimated value of the labor expended by him on the mining claims owned by Cambridge to satisfy the requirements of Nevada and Federal law. He now claims deductions for similar work done by him on claims owned by him, and for the estimated value of research done by him principally on behalf of Cambridge. He seeks these deductions under sections 162 and 615, both of which allow deductions for certain types of expenses "paid or incurred" by the taxpayer. As to the work done on behalf of Cambridge, there is no proof that the corporation either paid or incurred any liability to pay the petitioner for such work. Even if it had, it would be Cambridge, not the petitioner, who would be entitled to the deduction. With respect to the work done to maintain the claims owned by him personally, no deduction is allowable. Just as "imputed income" arising from the benefit a taxpayer's own services yield to him is not taxable under our system of taxation, neither is the "imputed expense" arising out of his exertions a proper deduction from income. Surrey & Warren, Cases on Federal Income Taxation 127 (1960); cf. *Frank Markarian*, 42 T.C. 640 (1964), affd. 352 F. 2d 870 (C.A. 7, 1965); *Palmer Hutcheson*, 17 T.C. 14 (1951). Labor performed by a taxpayer does not constitute an amount "paid or incurred" by him, and consequently, cannot be deducted by him under section 162 or section 615.

The petitioner argues that he is entitled to use a hybrid method of accounting, under the authority of section 1.446-1(a)(2), Income Tax Regs. His theory is, apparently, that he should be permitted to accrue currently, as a liability, amounts owed by him to himself on account of his labors, but include the value of such labor in income only when

and if such labor gives rise to cash income in the future. This argument is totally without merit. For one thing, we have found that the petitioner incurred no liability, in favor of himself or anyone else, to pay for the value of his services. For another, the regulations specifically provide:

a taxpayer who uses the cash method of accounting in computing gross income from his trade or business shall use the cash method in computing expenses of such trade or business. Similarly, a taxpayer who uses an accrual method * * * in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business. [Sec. 1.446–1(c)(1)(iv), Income Tax Regs.]

There is no evidence that the petitioner contemplated using anything but a cash method of accounting for any income which might be derived from his mineral operations. Finally, we cannot see how the method used by the petitioner would clearly reflect income. See sec. 446(b); sec. 1.446–1(a)(2), Income Tax Regs. For all the foregoing reasons, we hold that the petitioner may not account for his labors in the manner claimed.

Accordingly, the respondent properly disallowed the deductions for the research work, and for the work to maintain the mining claims, performed by the petitioner. Our conclusion avoids the necessity of passing on the correctness of the petitioner's valuation of such labor.

The petitioner also claimed in this proceeding a deduction for the use of his residence for his business purposes but failed to introduce any evidence to show that he is entitled to a deduction in an amount greater than that conceded by the respondent to be deductible, namely, $100 for 1964 and $100 for 1965.

Finally, the petitioner claims a deduction for the business use of a truck owned by him at the rate of 10 cents per mile for such business use in accordance with Rev. Proc. 66–10, 1966–1 C.B. 622. The respondent concedes that the petitioner is entitled to a deduction of $65.88, stipulated to be allowable as depreciation, but contends that the cited revenue procedure is not applicable inasmuch as the petitioner failed to show how many miles the truck was driven in 1965. However, there was testimony that the truck had been driven approximately 30,000 miles from the date of its acquisition in October 1965 to June 18, 1968, the date of the trial. We think it is inferable from the record that this mileage was distributed ratably over the period, and that the truck was therefore driven 2,727 miles in the petitioner's business in 1965. Consequently, in lieu of the deduction allowed by the respondent, the petitioner is entitled, under Rev. Proc. 66–10, *supra*, to a deduction in the amount of $272.70 in 1965.

*Decision will be entered under Rule 50.*